IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IAN S. KUNTZ, | ) | CASE NO.  5:24-CV-01849-BMB |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Ian Kuntz ("Plaintiff" or "Kuntz"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his application for Child's Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In August 2022, Kuntz filed an application for Child's Insurance Benefits, alleging a disability onset date of April 1, 1987,[2] and claiming he was disabled due to bipolar disorder, anxiety, and PTSD.

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

[2] At the hearing, Kuntz amended his alleged onset date to December 12, 2008.  (Transcript ("Tr.") 32-33.)  Therefore, the relevant period for this claim is December 12, 2008 through the day before Kuntz's 22nd birthday in March 2009.

1

(Transcript ("Tr.") 18, 59.)  The application was denied initially and upon reconsideration, and Kuntz requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 18.)

On November 9, 2023, an ALJ held a hearing, during which Kuntz, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On November 24, 2023, the ALJ issued a written decision finding Kuntz was not disabled.  (*Id.* at 18-22.)  The ALJ's decision became final on September 10, 2024, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On October 24, 2024, Kuntz filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6, 8, 10.)  Kuntz asserts the following assignment of error:

> (1) THE ALJ ERRED AT STEP 2 BY FAILING TO CONSIDER PLAINTIFF'S DIAGNOSES OF BIPOLAR DEPRESSION, ANXIETY, OBSESSIVE COMPULSIVE DISORDER, SCHIZOPHRENIA SPECTRUM AND/OR POST TRAUMATIC STRESS DISORDER AS SEVERE IMPAIRMENTS.

(Doc. No. 6 at 10.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Kuntz was born in March 1987 and turned 22 in March 2009.

### B.    Relevant Medical Evidence[3]

#### 1.    Medical evidence during the time period at issue

In an "End of Year Report" from July 1995, under general comments, Kuntz's teacher described Kuntz as follows:

> Ian is a quiet boy who is very popular within the class.  He works hard but sometimes loses concentration and will day-dream.  He has a mature personality and is always reliable.  A very pleasant member of the class.

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

(*Id.* at 248, 251.)

In high school, Kuntz passed all his classes his freshman, sophomore, and senior years despite many absences and tardies.  (*Id.* at 253.)  However, Kuntz failed several classes his junior year.  (*Id.*)  Kuntz missed 27.5 days during his junior year and 31 days during his senior year. (*Id.*)  Kuntz graduated in 2005 with a 2.02 GPA.  (*Id.*)

In 2006, Kuntz attempted 12 credit hours during winter quarter at Columbus State Community College, but he did not complete any credits.  (*Id.* at 234.)

On December 12, 2008, Kuntz went to the emergency room with complaints of episodes over the past few weeks where his heart was racing and he felt light-headed and like he was going to pass out.  (*Id.* at 324.)  He reported feeling anxious over the past few weeks.  (*Id.* at 330.)  Kuntz denied chest pressure but endorsed chest tightness.  (*Id.* at 324.)  Kuntz further denied shortness of breath, nausea, vomiting, and dizziness.  (*Id.*)  Kuntz told Mary Jo McMullen, M.D., that nothing new or different had happened that night, he had just decided to come in and get checked out.  (*Id.* at 324-25.)  He reported smoking and drinking occasionally.  (*Id.* at 324.)  He did not live alone and had no insurance.  (*Id.*)  Dr. McMullen noted normal examination findings and a normal EKG.  (*Id.*)  Mental examination findings were also normal.  (*Id.* at 330.)  Dr. McMullen noted Kuntz was watching television and she had to turn off the TV to get him to pay attention.  (*Id.* at 324.)  Dr. McMullen told Kuntz it was possible he may be having palpitations and may have tachycardia, so she referred him to a clinic to establish care with a physician and determine if further testing was needed.  (*Id.* at 324-25.)

On January 17, 2009, Kuntz went to the emergency room with complaints of chest pain that got worse after eating and heart palpitations, although his chest pain and palpitations had resolved.  (*Id.* at 361.)  Treatment providers noted the pain was indigestion and unable to be described.  (*Id.*)  Kuntz denied palpitations or a "funny" heartbeat when he was not eating.  (*Id.* at 362.)  He had not tried anything for

3

relief.  (*Id.*)  Treatment providers noted normal examination findings and referred Kuntz for an outpatient echocardiogram.  (*Id.*)  Treatment providers also prescribed Prilosec.  (*Id.*)  Treatment providers noted full orientation, normal affect, and cooperative behavior.  (*Id.* at 362-63.)

Kuntz completed 8 out of 12 credit hours at Columbus State Community College during winter quarter of 2009, with a 1.167 GPA.  (*Id.* at 234.)  Kuntz attempted 13 credit hours during spring quarter of 2009, but he did not complete any credits.  (*Id.*)

### 2. Medical evidence post-dating the time period at issue

On March 14, 2013, while attending the University of Akron, Plaintiff reached out to Diane Fashinpaur, MSN, CRNP, Director of Student Health Services at the University of Akron, with a question about Wellbutrin.  (*Id.* at 244-45.)  He followed up with another email, stating he had "been taking tests on bi-polar online and every one of them has said I have it…and I should note, I am extremely tired but have a 'wired' feeling in my head and cannot come close to falling asleep."  (*Id.* at 244.)  Fashinpaur directed Kuntz to not send personal health information through email and stated she preferred to discuss the issues Kuntz raised by telephone.  (*Id.* at 245.)

On December 7, 2017, treatment providers at Presbyterian Westchester Hospital admitted Kuntz for inpatient treatment of severe depressed Bipolar II disorder with psychotic features, moderate opioid use disorder, and alcoholism/alcohol abuse.  (*Id.* at 372.)  Kuntz reported a prior psychiatric admission in Thailand in November 2017 for suicidality.  (*Id.*)  Kuntz stated that he had returned from Thailand four days ago because he thought he would get better medical treatment here.  (*Id.* at 372-73.)  He endorsed worsening depressive symptoms over the past month, and reported he had a "long history of depression and anxiety" since he was an adolescent.  (*Id.* at 373.)  His mother died from cancer when Kuntz was 16, his stepfather was abusive, and his stepfather kicked Kuntz out after his mother died.  (*Id.*)  Kuntz reported he had been homeless since then and using alcohol and opioids to cope with his depression and

anxiety.  (*Id.*)  During a neuropsychiatric evaluation on December 5, 2017, treatment providers found Kuntz alert, oriented, and engaged with appropriate eye contact, full range of affect (though somewhat inconsistent with content when Kuntz was describing his psychiatric history), logical and goal-directed thought process, and normal judgment and insight.  (*Id.* at 373-74.)  Kuntz endorsed auditory clicks, although they had become less frequent and less intense.  (*Id.*)  Treatment providers noted:

> On an extensive measure of mood and personality, he demonstrated a consistent response style with no evidence of random endorsement of items. However, he endorsed an extremely high number of items that are sensitive to both over-reporting of symptoms and severe psychopathology.  While this may be reflective of true psychopathology in some individuals, this pattern of responses is more often seen in individuals who are exaggerating their emotional distress in either a plea for help or other secondary gain.  As such, his clinical profile was deemed invalid and could not be further interpreted.

(*Id.* at 374.)  Treatment providers discharged Kuntz in "much improved" condition on December 8, 2017. (*Id.* at 372, 376.)

On December 14, 2017, Kuntz saw Tim Riley, LPCC-S, for a full behavioral health intake following his inpatient treatment.  (*Id.* at 479, 487.)  Kuntz reported the inability to relax, irritability, and difficulty focusing.  (*Id.* at 479.)  He also endorsed anger, decreased sleep, forgetfulness, inattention, mood swings, nervousness, poor concentration, restlessness, and visual hallucinations.  (*Id.*)  Kuntz told Riley he had "always been moody with low self esteem and social anxiety," but he began experiencing "dissociative episodes" three to four years ago.  (*Id.* at 480.)  Kuntz stated he had had depression and anxiety for "years" and felt hopeless at times.  (*Id.*)  He moved to Thailand for a fresh start.  (*Id.*)  Kuntz reported peak alcohol use at age 22, drinking 8 beers every night.  (*Id.*)  He also began abusing opioids at age 25.  (*Id.* at 481.)  Kuntz reported taking Suboxone for four to five months until May 2017.  (*Id.*)  He told Riley he had stopped going to college because of depression and anxiety.  (*Id.* at 483.)

On examination, Riley found average eye contact, clear speech, impaired cognition, auditory hallucinations, constricted/blunted affect, cooperative behavior, anxious and irritable mood, poor insight,

fair judgment, and logical and irrational thought process. (*Id.* at 484.) Riley determined Kuntz met the preliminary criteria for bipolar disorder with psychotic features. (*Id.* at 485.) Kuntz also met the criteria for anxiety disorder, severe opioid use disorder in early remission, and mild alcohol use. (*Id.*)

On December 21, 2017, Kuntz saw Stephanie Bricklebank, MSW, LSW, and requested a reduction in his Risperdal because of how it made him feel. (*Id.* at 555.) Kuntz denied depression but endorsed feeling sad and down. (*Id.*) He also endorsed occasional feelings of worthlessness and frequent vertigo, as well as panic attacks a few times a week. (*Id.*) On examination, Bricklebank found Kuntz nervous/anxious with normal speech, good eye contact, a normal affect, and logical thought process. (*Id.* at 555-56.)

On January 26, 2018, Kuntz saw Bricklebank for follow up and reported he had stopped taking both his Risperdal and his Lithium because he did not like the side effects. (*Id.* at 549.) Kuntz reported he had felt "'disoriented'" and "'pretty bad'" since stopping his medication. (*Id.*) He felt depressed and angry, and he had mood swings. (*Id.*) On examination, Bricklebank found normal memory, normal judgment, depressed mood, normal speech, good eye contact, apathetic affect, and linear thought process. (*Id.* at 550.)

On January 31, 2018, Kuntz saw psychiatrist Benjamin Spinner, M.D., for an initial evaluation on the recommendation of Kuntz's therapist. (*Id.* at 687-88.) Kuntz reported being hospitalized twice three months ago. (*Id.* at 687.) He told Dr. Spinner that "[a]round age 22," he had tried fluoxetine and Wellbutrin, along with one or two other medications, but they made him feel overstimulated. (*Id.*) On examination, Dr. Spinner found Kuntz well-groomed and attentive with normal speech, a "'confused'" mood, organized thought process, and good insight. (*Id.* at 688.)

On March 27, 2018, Kuntz saw Jose Vicente Danguilan, M.D., for complaints of palpitations that occurred randomly. (*Id.* at 546.) The most recent occurrence started after Kuntz jogged two days earlier.

6

(*Id.*)  Another time when it occurred, he felt more anxious than usual.  (*Id.*)  Dr. Danguilan determined the palpitations were "likely typical post exertional physiologic tachycardia vs anxiety related," but noted he would check Kuntz's EKG.  (*Id.* at 548.)  Dr. Danguilan told Kuntz to monitor his symptoms and report back in one week.  (*Id.* at 548-49.)

On February 14, 2019, Kuntz saw Dr. Spinner for follow up and reported he remained "apprehensive about medication."  (*Id.* at 685.)  On examination, Dr. Spinner found Kuntz well-groomed and attentive with normal speech, an "'irritable'" mood, organized thought process, and good insight.  (*Id.*)

On February 26, 2019, Kuntz saw Dr. Spinner for follow up and reported he had stopped taking olanzapine after two days because he felt it made him feel number and more discouraged.  (*Id.* at 684.)  Kuntz told Dr. Spinner he did not want to take an antipsychotic mood stabilizer.  (*Id.*)  Kuntz noticed an improvement in his mood after a recent therapy session.  (*Id.*)  On examination, Dr. Spinner found Kuntz well-groomed and attentive with normal speech, an "'ok" mood, organized thought process, and good insight.  (*Id.*)

On April 9, 2019, Kuntz saw Dr. Spinner for follow up and reported a fluctuating mood.  (*Id.* at 682.)  Kuntz told Dr. Spinner he had worked as a busboy in a restaurant for four days but stopped because he found the environment "'unbearable'" and irritating.  (*Id.*)  On examination, Dr. Spinner found Kuntz well-groomed and attentive with normal speech, an "'ok" mood, organized thought process, and good insight.  (*Id.*)  Dr. Spinner recommended Depakote as a mood stabilizer.  (*Id.*)

On June 28, 2019, Kuntz talked to Dr. Spinner by telephone and reported he had not started Depakote and likely would not do so at this time.  (*Id.* at 681.)

That same day, Dr. Spinner wrote a letter stating that Kuntz struggled with Bipolar I Disorder with psychotic features, and his response to medication had been limited.  (*Id.* at 370-71.)  However, Kuntz benefitted from psychotherapy.  (*Id.* at 370.)  Dr. Spinner stated:

7

> Mr. Kuntz has struggles [sic] with his psychiatric symptoms for years, most likely since his adolescence. He has not been able to maintain stable employment due to the interference of his symptoms on his daily functioning. Mr. Kuntz has the capacity to comprehend instructions. Sustained attention and follow-through is limited due to the distress of mood fluctuations into mania and depression and due to the presence of psychotic thought. Ability to adapt is limited due to fluctuations in mood and presence of psychotic thought. Mr. Kuntz struggles to interact in any social or vocational context given anxiety and paranoia of others. This limits his ability to engage in any routine fashion with potential coworkers and supervisors and limits his ability to sustain regular responsibilities.
>
> In the past, Mr. Kuntz has held only short-term positions such as busboy, and has not been able, due to his psychiatric disorder, to sustain any employment.
>
> While Mr. Kuntz continues to pursue treatment, it is the case that treatment has not markedly altered his functional abilities to engage in routine activities. Rather, treatment is focused on preventing further hospitalizations; and on supporting means of coping with the distress of manic episodes, depressed episodes, and psychotic thought.

(*Id.* at 370-71.)

On October 1, 2019, Kuntz underwent a psychological consultative examination with Bryan Krabbe, Psy.D.  (*Id.* at 380, 386.)  Kuntz reported having bipolar disorder and that he hadn't been very stable.  (*Id.* at 380.)  He took Depakote.  (*Id.* at 381.)  He denied a history of abuse during his childhood and did not report any problems with focusing in school.  (*Id.*)  He reported getting along adequately with teachers and peers, although he endorsed a history of several detentions.  (*Id.*)  Kuntz told Dr. Krabbe he had held over 20 jobs in life and had been fired from 15 of them.  (*Id.* at 382.)  The longest job he had lasted eight months, when he was working the front desk at a friend's boxing gym.  (*Id.*)  Kuntz endorsed trouble staying focused and performing tasks in a timely manner, and he told Dr. Krabbe he did not get along with supervisors or coworkers.  (*Id.*)  He struggled to manage stress at work.  (*Id.*)  Kuntz endorsed symptoms of depression, including poor mood, feeling worthless, loss of energy, insomnia, decreased motivation, trouble with concentration, and social withdrawal.  (*Id.*)  He also endorsed symptoms of mania, including pressure to keep talking, distractibility, increased activity, impulsivity, mood swings,

racing thoughts, and inflated self-esteem.  (*Id.*)  Kuntz told Dr. Krabbe he often had low motivation and struggled to remember his appointments and medication.  (*Id.*)

On examination, Dr. Krabbe found Kuntz cooperative with adequate energy, pressured speech with some loose associations, and full orientation, as well as a nervous appearance and some signs of anxiety.  (*Id.* at 383.)  Dr. Krabbe noted Kuntz had no problem following simple instructions.  (*Id.*)  Dr. Krabbe further found sufficient judgment, adequate insight, adequate short-term memory, satisfactory attention and concentration, and normal intellectual functioning.  (*Id.* at 384.)  Kuntz's diagnoses included unspecified bipolar and related disorder and unspecified opioid-related disorder, in sustained remission.  (*Id.*)  Dr. Krabbe opined that Kuntz "described symptoms of depression that may compromise his ability to respond to work pressures leading to increased emotional instability and withdraw [sic]."  (*Id.* at 386.)  In addition, Kuntz "described symptoms of mania that may compromise his ability to respond to work pressures leading to increased likelihood of agitation."  (*Id.*)

On December 30, 2019, Kuntz called Dr. Spinner with a question about anesthesia.  (*Id.* at 680.)  During that conversation, Kuntz reported he was doing well and continued to go to therapy, but he did not want to pursue medication treatment for his mental health symptoms.  (*Id.*)

On January 10, 2020, EMS responded to a call for a person having an anxiety attack.  (*Id.* at 1040-42.)  Kuntz told EMS he was exercising when he began having a panic attack and that he did not feel safe going home.  (*Id.* at 1042.)  EMS noted that after "some therapeutic conversation" Kuntz felt much better and told EMS he was going to drive home.  (*Id.*)  Kuntz did not want to go to the hospital.  (*Id.*)  He told EMS he saw a therapist and psychiatrist for his bipolar disorder.  (*Id.*)

On September 8, 2020, despite no longer treating Kuntz (*id.* at 678), Dr. Spinner wrote a letter in support of Kuntz's Total and Permanent Disability discharge application.  (*Id.* at 389.)  Dr. Spinner stated that Kuntz's bipolar disorder was "severe and persistent," and Kuntz experienced "regular recurrent

9

episodes of psychosis in the context of both manic and depressive mood states." (*Id.*)  Dr. Spinner again opined that "[t]hese episodes have been present likely since his adolescence." (*Id.*)  Dr. Spinner further opined that Kuntz's "symptoms remain present chronically: they have prohibited and continue to prohibit his ability to engage in work-related activity." (*Id.*)

On November 23, 2020, Kuntz went to the ER with complaints of mood changes and fear of going into a complete manic episode.  (*Id.* at 398.)  Treatment providers sent him by pink slip to Portage Path Behavioral Health.  (*Id.*)  Kuntz reported delusions, paranoia, mood swings, and racing thoughts, and he did not feel safe at home.  (*Id.*)  He denied any suicidal ideation, although he reported having thoughts of harming himself even though he didn't want to do so.  (*Id.*)  Kuntz reported he had been off his medications for two years.  (*Id.*)  On examination, Kelly Buehler, R.N., found good insight and judgment, intact memory, normal activity, average eye contact, normal speech, no cognitive impairment, no delusions or hallucinations, logical thought process, and cooperative behavior.  (*Id.* at 399-400.)

On November 25, 2020, the U.S. Department of Education approved Kuntz's Total and Permanent Disability discharge application and discharged his federal loans.  (*Id.* at 246-47.)

On July 28, 2021, Kuntz saw Brandon Rapier, M.D., for follow up from an ER visit and panic attack.  (*Id.* at 511.)  Kuntz complained of chest pain that started that day and that he had had a panic attack that morning.  (*Id.*)  Kuntz denied palpitations and described constant aching pain in his chest.  (*Id.* at 512.)  Kuntz told Dr. Rapier had had been feeling "very anxious" and had been stressed about tetanus after stepping on a nail.  (*Id.*)  Dr. Rapier noted Kuntz's EKG was normal and suspected his chest pain was related to anxiety.  (*Id.* at 511.)  Kuntz stated he was seeing his therapist on Tuesday.  (*Id.* at 512.)

On February 23, 2022, Kuntz saw Sophia Zinni for an initial behavioral health assessment.  (*Id.* at 494.)  Kuntz reported having intrusive thoughts about self-harm.  (*Id.*)  On examination, Zinni found full orientation, impaired memory, anxious, agitated, and guilty mood or affect, appropriate thought processes,

10

flight of ideas, fair insight and judgment, fair attention, and poor concentration. (*Id.*) Kuntz's diagnoses consisted of bipolar disorder, PTSD, and anxiety. (*Id.*) Zinni opined that Kuntz would benefit from continuing to see his psychiatrist regarding possible medication options. (*Id.* at 499.)

On March 9, 2022, Kuntz saw Zinni for follow up. (*Id.* at 667.) On examination, Zinni found cooperative attitude, normal speech, anxious mood, appropriate affect, full orientation, and intact memory. (*Id.*) Zinni found similar findings on examination on March 30, April 13, April 27, May 13, and May 26, 2022. (*Id.* at 668-72.) At his May 26 appointment, Kuntz told Zinni he was going to Mexico with a friend. (*Id.* at 672.) At his June 9, August 5, and August 19 appointments, Zinni found Kuntz exhibited poor judgment. (*Id.* at 673-75.) At his August 19 appointment, Kuntz told Zinni he had applied for two English teaching jobs and did not get either of them; this made him angry, and he sent an email to the woman who had conducted one of the job interviews. (*Id.* at 675.) He was also trying to close on a loan on a house. (*Id.*) Zinni noted Kuntz exhibited a depressed and anxious mood that day. (*Id.*)

On September 9, 2022, Kuntz saw Zinni for follow up. (*Id.* at 1013.) On examination, Zinni found cooperative attitude, normal speech, depressed and anxious mood, appropriate affect, full orientation, poor judgment, and intact memory. (*Id.*) Zinni found similar findings on examination on October 13, 2022. (*Id.* at 1014.)

On September 15, 2022, Kuntz went to the ER with complaints of heart palpitations that he thought might be a panic attack. (*Id.* at 1059.) Kuntz reported that the palpitations began the night before when he was out to dinner with his uncle and realized he may have eaten food with alcohol in it; this made him anxious, as he had been sober for three years and was afraid of relapsing. (*Id.*) Kuntz denied chest pain, shortness of breath, dizziness, and lightheadedness. (*Id.*) He told treatment providers his symptoms were identical to those he has had in the past, "although it has been several years since he has had a 'panic attack.'" (*Id.*) Kuntz reported that since becoming sober and living at home his anxiety had been well

controlled, and he saw a counselor on a regular basis. (*Id.*) He planned to take a vacation soon and had traveled to Cleveland that weekend as a "'test'" to see how he did, as his anxiety increased when he was away from home or in new places. (*Id.*) Kuntz thought that was what was happening. (*Id.*)

On October 25, 2022, Kuntz waved down a police officer and asked for help, telling the officer he felt odd and wanted medical attention. (*Id.* at 1046.) The officer called EMS. (*Id.*) Kuntz told EMS he had been driving home when he became dizzy and lightheaded. (*Id.*) He admitted to having anxiety and that he had been nervous that his phone was dying. (*Id.*) EMS took Kuntz's vitals, which were normal, and Kuntz declined further evaluation and care. (*Id.*)

On October 28, 2022, State Representative Zach Milkovich, a friend of Kuntz's sister, wrote a letter stating he was "aware" that Kuntz had struggled "pretty severely with anxiety and depression in his early adulthood" and that Kuntz "often had trouble maintaining employment, supporting himself and staying in school." (*Id.* at 241.)

On November 10, 2022, EMS responded to Kuntz's residence and found him standing outside complaining of dizziness after his carbon monoxide detector had gone off. (*Id.* at 1053.) Kuntz told EMS he had anxiety and had read about people getting sick and dying from carbon monoxide poisoning. (*Id.*) EMS noted Kuntz spoke in clear and complete sentences and answered all questions appropriately. (*Id.*) Testing of the residence revealed a normal carbon monoxide reading and normal gas level readings. (*Id.*) Kuntz refused transport and any further care. (*Id.*)

On November 29, 2022, EMS responded to Kuntz's residence and found him outside. (*Id.* at 1055.) Kuntz reported he had been eating dinner when he felt like something got stuck in his throat. (*Id.*) While Kuntz cleared what was in his throat, it caused him to have a panic attack. (*Id.*) Kuntz reported he was feeling better and had calmed down after talking to EMS. (*Id.*) Kuntz declined any transport or further care. (*Id.*)

On March 14, 2023, EMS responded to Kuntz's residence and met Kuntz at the front door.  (*Id.* at 1057.)  Kuntz reported waking up from a deep sleep with tinnitus and confusion as to what day it was, which caused Kuntz to panic.  (*Id.*)  Kuntz refused transport to the hospital.  (*Id.*)

On April 27, 2023, Kuntz saw Catherine Buswell, PMHNP-BC, for a psychiatric assessment and reported increased flashbacks for the past seven days.  (*Id.* at 1081, 1086.)  He told Buswell he broke down multiple times a day and felt physically ill.  (*Id.* at 1081.)  Kuntz also endorsed depression, mood swings, and panic attacks.  (*Id.*)  He went to the ER every other month.  (*Id.*)  Kuntz received half the profits from investments and lived alone in an apartment.  (*Id.*)  He told Buswell he had been off psychiatric mediations for years.  (*Id.*)  On examination, Buswell found impaired judgment and insight, agitated psychomotor activity, circumstantial and preservation speech, a dysphoric and anxious mood, a constricted affect, obsessive and paranoid thought process, auditory hallucinations, and impaired concentration.  (*Id.* at 1082.)  Buswell gave Kuntz a list of medications to research.  (*Id.* at 1084.)  Kuntz's diagnoses consisted of unspecified mood disorder and PTSD.  (*Id.* at 1085.)

On April 29, 2023, Kuntz went to the ER requesting inpatient psychiatric admission after having increased anxiety and flashbacks and feeling as if he was in a manic episode.  (*Id.* at 1020.)  On examination, Josephine Chen, D.O., found Kuntz difficult to engage and superficially cooperative with psychomotor agitation, anxious and increasingly intense affect, circumstantial thought process that was disorganized at times, illogical thinking, impaired recent memory, and poor judgment and insight.  (*Id.* at 1023.)  Dr. Chen determined Kuntz required involuntary psychiatric admission.  (*Id.* at 1026.)

On April 30, 2023, Kuntz saw Marilena Achim, M.D., for a psychiatric evaluation.  (*Id.* at 1072.)  Kuntz reported he had gone to the ER because he could not contact his therapist and needed to talk to someone because of his increased anxiety and intrusive thoughts.  (*Id.* at 1072-73.)  He wanted to go home and follow up on an outpatient basis.  (*Id.* at 1073.)  On examination, Dr. Achim found fair insight and

judgment, normal speech, normal psychomotor activity, and logical and goal-directed thought process. (*Id.*)  Kuntz planned to stay with his sister for a while, and his sister told Dr. Achim she did not have any concerns for his safety.  (*Id.* at 1075.)

On May 22, 2023, Kuntz saw Radisa Tosanovic, D.O., for follow up after his recent psychiatric hospitalization.  (*Id.* at 1065.)  Dr. Tosanovic noted Kuntz was unwilling to try antipsychotic medications but that as needed propranolol was available.  (*Id.*)

On June 20, 2023, Kuntz saw Hoang Ta, D.O., for complaints of wheezing after moving into a new apartment.  (*Id.* at 1034.)  Dr. Ta noted that, on examination, Kuntz was "anxious with pressured speech and appears paranoid," and Kuntz became tearful when asked about his medical history and PTSD. (*Id.* at 1035.)   On examination, Dr. Ta found rapid speech, cooperative behavior, paranoid thought content, normal cognition and memory, and judgment that was not impulsive.  (*Id.* at 1037.)

On July 31, 2023, Kuntz saw David Vavrinak-Davis, D.O., to establish care.  (*Id.* at 1067-68.) Kuntz reported he had not taken propranolol for situational anxiety.  (*Id.* at 1068.)  Kuntz endorsed quick mood changes, depressive symptoms, and near daily night terrors.  (*Id.*)  Dr. Vavrinak-Davis noted Kuntz was concerned over having cancer.  (*Id.*)  Dr. Vavrinak-Davis started Kuntz on prazosin and ordered consults to psychiatry and a behavioral health adult social worker.  (*Id.* at 1067.)

On October 10, 2023, Kuntz's sister, Tracy Cochran, wrote a letter in support of his application for disability benefits.  (*Id.* at 281.)  In her letter, Cochran reported that when Kuntz was seven, their mother told Cochran that Kuntz was "'seeing things'"; while their mother was concerned, "no action was taken to provide [Kuntz] with medical or other help."  (*Id.*)  Cochran recalled that when Kuntz was eight and nine years old, there were times when Kuntz talked non-stop.  (*Id.*)  From age 10 through 18, Kuntz suffered from "intense headaches" and he had a harder time focusing in school.  (*Id.*)  He also missed school a lot. (*Id.*)  From age 13 through 18, Kuntz seemed to have social impairments.  (*Id.*)  From ages 16 through 18,

Kuntz experienced panic attacks and worried that he was having a heart attack, so they "would frequently end up in the emergency room with heart monitors and tests." (*Id.*)  Although this happened many times, "no medical evidence would be found during these emergency room visits to indicate a true medical problem or lead to further care." (*Id.*)  Cochran stated, "Looking back on these instances, I can see it was the beginning of a pattern of instability in his mental health. (Panic attacks, mania/depression, visions, and incapacitating anxiety)[.]" (*Id.*)  Their mother passed away when Kuntz was 17, and Cochran stated that Kuntz's mental health episodes became worse in his 20s and 30s. (*Id.* at 282.)  However, to Cochran, it was "clear they began early on without our mother or any other adult seeking help" for Kuntz. (*Id.*)  Kuntz began living with Cochran about five years ago. (*Id.*)  Cochran reported that Kuntz's "panic attacks, hallucinations, mania/depression, and incapacitating anxiety [have] continued throughout his adulthood." (*Id.*)

On July 18, 2023, Anderson Hawes, LPCC, LSW, LICDC, wrote a letter to Kuntz's attorney regarding the clinical assessment Hawes conducted on February 3, 2018. (*Id.* at 1030-32.)  Hawes opined:

> The results of the assessment indicated Mr. Kuntz had been experiencing debilitating symptoms including pronounced mood instability, persistent delusions, hallucinations, paranoia and avoidant behavior suggestive of a severe and persistent psychotic disorder that first appeared in early adolescence, at age 14 or 15 years old. His school records indicated he had difficulties with excessive absences (truancy), learning difficulties, and ability to pay attention in school. In addition to these deficits, he had trouble engaging socially, "other kids called me the mute". His mother was his primary parent and was ill and passed away during his adolescence and it appeared that she was unable to assist him to address his mental health needs.

(*Id.* at 1030.)  Hawes further opined that Kuntz's "instability since adolescence had resulted in recurrent episodes of hospitalizations, emergency room visits, intensive outpatient treatments and multiple failed attempts of various medication regimens." (*Id.*)  In addition, Kuntz's "symptoms had remained chronic and prohibited his ability to engage in work related activity, going to college and impaired his social adjustment." (*Id.*)  Hawes opined that Kuntz's mental health symptoms limited Kuntz's "ability to engage

15

regular predictable routines and often prohibit social adaption." (*Id.* at 1031.)  Hawes further opined

Kuntz's ability to interact with others was "severely impaired by paranoia," and his anxiety and paranoia

limited his ability to engage and interact with others "in any social or vocational context." (*Id.* at 1032.)

On November 6, 2023, Hawes wrote a second letter to Kuntz's attorney. (*Id.* at 1306-07.)  Hawes

explained that Kuntz's sister, a schoolteacher, had provided "[h]istorical information regarding Mr. Kuntz

during his childhood and adolescence," which "was corroborated by [Kuntz's] school records (high school

and college)." (*Id.* at 1306.)  Hawes stated he had also "reviewed previous medical records from Akron

General Medical Center (2008), Ohio State Medical Center (2009)." (*Id.*)  Hawes opined:

> Based upon my assessment of Mr. Kuntz, a review of historical medical and
> school records and corroborated family member reports, it is medically certain
> by a preponderance of evidence that Mr. Kuntz had been suffering from
> Bipolar Depression with Psychotic Features, Anxiety, Post Traumatic Stress
> Disorder and accompanying severe and pervasive emotional instability
> throughout his adolescence, early and current adult life. It is also certain that
> these disabling psychiatric disorders have led to Mr. Kuntz's inability to
> sustain fulltime employment well before March 17, 2009.

(*Id.*)  Hawes further opined that Kuntz's mental impairments would limit his ability to interact with others,

maintain persistence and concentration, and sustain work. (*Id.*)  Hawes further opined that Kuntz would

be off task 7-10 minutes per hour in an eight-hour workday and would need "more than extra reminders or

assistance, such as frequent redirection from co-workers and/or supervisors." (*Id.*)

## C.      State Agency Reports

On January 15, 2023, Vicki Warren, Ph.D., reviewed the record and opined that the file was

"insufficient prior to age 22." (*Id.* at 63.)

On April 18, 2023, on reconsideration, Kristen Haskins, Psy.D., reviewed the file and affirmed Dr.

Warren's findings. (*Id.* at 69-71.)  Dr. Haskins explained: "No new evidence at recon. No changes or new

conditions and no new t's. I have reviewed all evidence in file, and the assessment of 12/01/2022 is

16

consistent with and supported by the evidence. Therefore, prior findings from initial are affirmed as written." (*Id.* at 69.)

**D.  Hearing Testimony**

During the November 9, 2023 hearing, Kuntz testified to the following:

- He lives with his sister.  (*Id.* at 33.)  He holds a driver's license.  (*Id.*)  He panics if he drives more than 30 minutes from home.  (*Id.* at 43.)  He avoids the highway because he panics if he gets on the highway.  (*Id.* at 43-44.)  He has called 911 many times. (*Id.* at 44.)

- He can do "basic things" like go to the grocery store and go to his doctor appointments.  (*Id.* at 44.)  He usually shops in the mid-afternoon.  (*Id.*)  He has had panic attacks and "PTSD situations" at the grocery store, and he gets paranoid and thinks people are talking about him.  (*Id.*)  He feels comfortable with a routine.  (*Id.* at 45.)  Besides his sister, he talks to his ex-brother-in-law every day.  (*Id.*)  He does not have many friends.  (*Id.*)

- He graduated from high school.  (*Id.* at 34.)  He was never held back, although he often had to take summer school because of failing grades.  (*Id.* at 35.)  He played basketball in ninth grade.  (*Id.*)  He did not remember being in chess club, technical crew, tennis, Latin club, or Fellowship of Christian Students in high school.  (*Id.* at 35-36.)

- After graduating, he tried a lot of things and bounced around a lot.  (*Id.* at 36.)  His mother had passed away and he did not have much family.  (*Id.*)  He was "constantly getting fired from jobs."  (*Id.* at 36-37.)  He was "constantly having heart palpitations and panic attacks all day long," but he did not have money for treatment and did not have insurance.  (*Id.* at 37.)  He went to the ER a few times when his symptoms got bad.  (*Id.*)  His mother passed away when he was in high school.  (*Id.*)  His stepfather kicked him out after he got remarried, which was just after Kuntz had graduated high school.  (*Id.*)

- He remembers not leaving his room for a long period of time before he turned 22.  (*Id.* at 38.)  Now that he has a better understanding of mental health, he "was probably in a very serious depressive state and [] just didn't know what was going on." (*Id.*)  He couldn't say if his mom's death triggered his mental health symptoms; he remembers having issues before that.  (*Id.* at 39-40.)  He "always had issues with truancy in school" and "everything was always overwhelming" to him.  (*Id*. at 40.)  However, his mom's death did not help; because he no longer had a support system and he was on his own, things got "really, really bad" after she died.  (*Id.*)  He always had anxiety and could not interact in social settings like other people.  (*Id.* at 41.)

- He gets panic attacks if he eats large meals.  (*Id.* at 39.)  He has "constant" paranoia and flashbacks.  (*Id.* at 42.)  He wakes up in the middle of the night with night terrors.  (*Id.*)

- He receives mental health treatment, but he does not take any prescription medications because of "intolerable side effects" that are worse than his symptoms when he is not taking medication.  (*Id.* at 34.)  The side effects include increased anxiety, night terrors, insomnia, mental absence, brain fog, involuntary movements, angry outbursts, delusions, weight gain, "brain zaps," "zombie-like state[s]," and suicidal ideation.  (*Id.* at 39.)  He sees his counselor every few weeks now; he used to see him once a week.  (*Id.* at 42.)  Therapy has helped a lot.  (*Id.*)

- He did not receive regular treatment until 2017, when things had gotten so bad that he could not take care of himself.  (*Id.* at 37.)  He moved in with his sister and she started paying for his treatment.  (*Id.*)

- He cannot handle working.  (*Id.* at 40.)  His brain "shuts down" in work situations.  (*Id.*)  He got fired from jobs because he struggled to interact with others and had difficulty with routine tasks.  (*Id.* at 41.)  He could not hide "the psychotic state" he was in, and he was "constantly" having panic attacks.  (*Id.*)  He could not handle the pressure in social situations.  (*Id.*)  He had a problem with illegal drugs at some of these jobs.  (*Id.* at 46.)  He self-medicated at certain points in his life.  (*Id.*)

### III.  STANDARD FOR DISABILITY

The Social Security Act mandates the satisfaction of three basic criteria to qualify a child for surviving child's insurance benefits of an insured, namely, the child must: (1) have filed an application for such benefits; (2) have been unmarried at the time of the filing and must have been either: (i) under eighteen years of age or a full-time elementary or secondary school student under nineteen, or (ii) under a disability which began before age 22; and (3) have been dependent upon the deceased parent at the time of the parent's death. 42 U.S.C. § 402(d)(1). In the present case, the only issue raised by the parties relates to whether Plaintiff was "under a disability which began before age 22."

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.

20 C.F.R. § 404.1520(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Born on March **, 1987, the claimant had not attained age 22 as of April 1, 1987, the alleged onset date (20 CFR 404.102 and 404.350(a)(5)).

2.    The claimant has not engaged in substantial gainful activity since April 1, 1987, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    Prior to the date the claimant attained age 22, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment (20 CFR 404.1520(c)).

4.    The claimant has not been under a disability, as defined in the Social Security Act, at any time prior to March 16, 2009, the date he attained age 22 (20 CFR 404.350(a)(5) and 404.1520(c)).

(Tr. 20-21.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, Case No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In his sole assignment of error, Kuntz challenges the ALJ's findings at Step Two.  (Doc. No. 6 at 10.)  Kuntz asserts "there are two significant opinions that established the groundwork, detailing the signs and symptoms necessary to prove [he] suffered from at least a severe impairment at Step Two."[4]  (*Id.* at

---

[4] In his brief, Kuntz conflates the ALJ's finding of no medically determinable impairment with a finding of no severe impairment.  (Doc. No. 6.)  However, these are two separate findings; an ALJ must find a medically determinable impairment before making a severity determination.  *See* 20 C.F.R. § 404.1521 ("After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe.").

11.) Those opinions consist of the two opinions by Dr. Spinner, dated June 28, 2019 and September 8, 2020, and the two opinions by LPCC Hawes, dated July 18, 2023 and November 6, 2023. (*Id.*) Kuntz maintains that these opinions are consistent with the 2008 and 2009 emergency room records, the letter provided by his sister, and his school records. (*Id.* at 12.) Relying on *McClenton v. Commissioner of Social Security*, 2023 WL 154823, at *5 (W.D. Mich. Jan. 11, 2023), Kuntz argues the ALJ "viewed this case through the wrong lens" when the ALJ ended the sequential analysis at Step Two. (*Id.* at 13.) Kuntz asserts that "[t]he ALJ should have focused his inquiry on whether Plaintiff's sister's letter, Zack Milkovich's letter, the school evidence, and the failed work positions—viewed in light of the progressive nature of his mental health issues—established the requisite 'linkage' to the presence of Bipolar Depression, Anxiety, Obsessive Compulsive Disorder, Schizophrenia spectrum and/or Post Traumatic Stress Disorder symptoms during the relevant period." (*Id.* at 13-14.) Kuntz also argues that the ALJ's analysis of the opinions of Dr. Spinner and LPCC Hawes lacks the support of substantial evidence. (*Id.* at 15-16.)

The Commissioner responds that Kuntz failed to meet his burden of proving he had a severe medically determinable impairment. (Doc. No. 8 at 1.) Therefore, the ALJ properly determined that Kuntz's impairments "were not medically determinable prior to age 22" and denied Kuntz's disability claim at Step Two. (*Id.* at 1-2.) The Commissioner argues that, for the period at issue, "the record lacks any abnormal objective evidence in the form of mental laboratory findings or signs as required by the regulations." (*Id.* at 12) (citing 20 C.F.R. §§ 404.1502(c), (f), (g); 404.1529(c)(2), (4)). In addition, Kuntz's argument that the ALJ "failed to consider 'other evidence'" is meritless, "as the ALJ expressly considered the treating source opinions as well as the lay opinion of Plaintiff's sister (Tr. 21)." (*Id.* at 13.) The Commissioner also argues that *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048

22

(6th Cir. 1983), on which Kuntz relies, is inapposite, while *McClenton* is distinguishable and not binding on this Court.  (Doc. No. 8 at 13-14.)  Therefore, the Court should affirm the ALJ's decision.  (*Id.* at 14.)

In reply, Kuntz argues that the Commissioner, like the ALJ, "mischaracterized [the] mental status examinations during the relevant period."  (Doc. No. 10 at 1.)  Kuntz asserts that the physical symptoms he complained about at emergency room visits, as well as his anxiety, "align[] with the clinical understanding of somatic presentations of anxiety, particularly in individuals without insight into their mental state."  (*Id.* at 1-2.)  Kuntz maintains that "to rely on the absence of physical test results as evidence of the absence of an impairment is a misapplication of the agency's own ruling."  (*Id.* at 3.)  Kuntz also argues that the "retrospective" opinions of Dr. Spinner and LPCC Hawes "were wrongly dismissed."  (*Id.*)  Kuntz asserts that the Commissioner's brief "fails to meaningfully grapple with the extensive and consistent lay evidence that supports the onset of mental illness during the relevant period."  (*Id.* at 4.)  In addition, Kuntz maintains that the authority on which the Commissioner relies—*Dyson v. Commissioner of Social Security*, 786 F. App'x 586, 588 (6th Cir. 2019), *Robinson v. Commissioner of Social Security*, 2023 WL 4078487 (N.D. Ohio May 10, 2023), and *Griser v. Commissioner of Social Security*, 721 F. App'x 473, 478 (6th Cir. 2018)—is distinguishable.  (Doc. No. 10 at 5.)  Kuntz argues that the Commissioner's argument that *Lashley* and *McClenton* are distinguishable "on factual grounds ignored the core legal principle shared by both cases: lay testimony and retrospective opinions must be considered when consistent with the medical and factual record."  (*Id.* at 6.)

At Step Two of the sequential evaluation process, an ALJ must evaluate whether a claimant has a "medically determinable physical or mental impairment."  20 C.F.R. § 404.1520.  A medically determinable impairment ("MDI") "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. §

404.1521. The regulations define "objective medical evidence" as "medical signs, laboratory findings, or both, as defined in § 404.1502(f)." 20 C.F.R. § 404.1513. The regulations define "laboratory findings" as "one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X–rays), and psychological tests." 20 C.F.R. § 404.1502(c). The regulations define "signs" as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1502(g).

"[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone." Social Security Ruling ("S.S.R.") 96–4P, 1996 WL 374187, at *1 (S.S.A. July 2, 1996). "Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." *Id.* *See also* 20 C.F.R. § 404.1529(b) ("Your symptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). *See also Crumrine-Husseini v. Comm'r of Soc. Sec.*, Civil Action 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (S.D. Ohio March 30, 2017). Nor can a medical opinion establish the existence of a medically determinable impairment. 20 C.F.R. § 404.1521. The claimant bears the burden

of establishing the existence of a medically determinable impairment. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.").

Here, the ALJ found as follows at Step Two:

> The Act defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. An "impairment" must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical or laboratory diagnostic techniques. Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings (20 CFR 404.1521 and 404.1529 and SSR 16-3p).

> No symptom or combinations of symptoms by itself can constitute a medically determinable impairment. In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process (SSR 16-3p).

> Scattered treatment records in 2003 (1F/29), 2008 (2F/4), and 2009 (4F/6), confirm no past medical or surgical history. The claimant was briefly treated for "possible" palpitations (2F/5), and unspecified chest pain, now resolved (4F/8, 11), against a backdrop of normal electrocardiographic studies (2F/4), (4F/7) and a normal chest x-ray (3F/5). He had an episode of urticaria in 2009 for which no etiology was determined; however, he improved with Benadryl and Pepcid (2F/14), and the condition was assessed as likely secondary to an upper respiratory infection (2F/17), itself transient. **I acknowledge opinions of two treating sources suggesting that these episodes constitute proof of an extant, but undiagnosed, psychiatric disorder; however, opinions cannot be substituted for medical evidence, particularly when neither source had initially met with the claimant until more than five years after his attainment of age twenty-two**.

> As the claimant's sister had noted in her letter supporting the claim: "…no action was taken to provide Ian with medical or other help", and later: "…no

25

medical evidence would be found during these emergency room visits to indicate a true medical problem or lead to further care" (19E/1).

As of the close of the evidence, the claimant has failed to demonstrate a medically determinable impairment prior to his attainment of age twenty-two.

Accordingly, there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment.

(Tr. 20-21) (emphasis added).

The Court agrees with the Commissioner that *McClenton*, the primary case on which Kuntz relies, is factually distinguishable. The claimant in *McClenton* suffered from Huntington's disease, "a hereditary neurodegenerative disease that usually onsets in mid-life and gradually worsens in stages over time, ultimately resulting in confinement and the need for total care at home or in a hospital or nursing home." 2023 WL 154823 at *4. Kuntz suffers from no such progressive disease. In addition, in *McClenton*, a physician formally diagnosed the claimant with Huntington's disease less than a year after the claimant's date last insured. *Id.* at *5. Here, Dr. Spinner and LPCC Hawes issued their opinions over 10 years and over 14 years, respectively, after Kuntz turned 22, and neither source began treating Kuntz until well after he turned 22. (Tr. 370-71, 389, 1030-32, 1306-07.) Finally, *McClenton*—which relied on a Fourth Circuit case—is non-binding precedent.

This Court recently addressed a factually analogous case where the ALJ found no medically determinable impairments and ended the sequential evaluation at Step Two:

The Court agrees with the Commissioner. As noted above, to qualify for DIB, a claimant must prove she was disabled prior to the expiration of her insured status. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). To establish disability, the claimant must prove she had a severe medically determinable impairment, which "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and thus "must be established by objective medical evidence from an acceptable medical source." *Dowey v. Comm'r of Soc. Sec.*, No. 5:17CV2489, 2018 WL 7681369, at *3 (N.D. Ohio Dec. 21, 2018) (citations omitted), *report and recommendation adopted sub nom. Dowey v. Berryhill*, No. 5:17CV2489, 2019 WL 580570 (N.D. Ohio

26

Feb. 12, 2019); *Higgs v. Secretary,* 880 F.2d 860, 862–63 (6th Cir. 1988); 20 C.F.R. § 404.1521.

Here, Brown's amended disability onset date was September 30, 2013, and her date last insured was June 30, 2015. Thus, for the ALJ to consider Brown's sleep disorders as impairments qualifying her for disability, Brown needed to present objective medical evidence that she experienced these conditions between September 30, 2013 and June 30, 2015. As Brown herself acknowledges in her briefing, the record is devoid of any medical evidence from before July 2017, over two years after her insured status expired (*See* ECF No. 8 at 9). True, as Brown argues, an ALJ may consider post-date last insured evidence when conducting her step-two analysis. *See Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). **But the post-expiration evidence Brown points to—a statement made by Nurse Practitioner McLaughlin in a May 2020 treatment note that Brown's idiopathic hypersomnia was "probably due to prior head injury" in combination with her own statements regarding the timeline of her sleep condition symptoms—is not the credible, objective medical evidence required to substantiate the existence of a medically determinable impairment through Brown's date last insured. Neither the nurse practitioner statement that Brown's idiopathic hypersomnia was "probably due to prior head injury," nor Brown's own statements about the onset and worsening of her sleep conditions are or provide laboratory findings or medical signs—which is how Social Security regulations define objective medical evidence.** SSR 16-3p ("We call the medical evidence that provides signs or laboratory findings *objective medical evidence*. We must have objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms."). And Brown points to no law suggesting that a claimant may prove the existence of a medically determinable impairment by providing post-expiration evidence that does not qualify as the type of objective medical evidence required to prove a medically determinable impairment with pre-date last insured evidence. Additionally, the evidence offered by Brown to substantiate that she had a severe impairment prior to her insured status expiring consists of her own statements related to her symptoms worsening and her nurse practitioner's opinion that her conditions were "probably due to former head injury." **The Social Security regulations, as described above, specifically state that ALJs will *not* use these types of evidence to establish the existence of a medically determinable impairment. 20 C.F.R. § 404.1521.** Thus, the ALJ need not have considered this evidence during her step-two analysis, and her determination that there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment is supported by substantial evidence.

*Brown v. Comm'r of Soc. Sec.*, Case No. 5:24-CV-00578-CEF, 2024 WL 4706709, at *5 (N.D. Ohio Nov. 7, 2024) (emphasis added), *report and recommendation adopted by* 2024 WL 4881673 (N.D. Ohio Nov. 25, 2024).

As set forth in detail above, the relevant evidence in the record for the period at issue (December 12, 2008 to March 2009) is limited.  There are only two medical records – one in 2008 and one in 2009 – during that time.  A December 12, 2008, emergency room visit revealed normal examination findings and a normal EKG.  (Tr. 324-30.)  A January 17, 2009, emergency room visit revealed normal examination findings, including full orientation, normal affect, and cooperative behavior.  (*Id.* at 362-63.)  Contrary to Kuntz's assertions, the ALJ considered the opinions of Dr. Spinner and LPCC Hawes, as well as the letter from Kuntz's sister, in his Step Two analysis.  (*Id.* at 21.)  While the ALJ failed to mention Kuntz's school records, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (citation and internal quotation marks omitted).  Furthermore, Kuntz's school records lack any objective medical evidence regarding a mental impairment, noting only that Kuntz "sometimes" lost concentration and day-dreamed.  (Tr. 251.)

In addition, Dr. Spinner's opinions are not as conclusive as Kuntz suggests, as Dr. Spinner opined only that Kuntz's impairments had "likely" been present since Kuntz's adolescence.  (Tr. 370-71, 389.) *See Brown*, 2024 WL 4706709, at *7 ("Additionally, like the psychiatrist in *Price* expressed uncertainty regarding the origin and onset of claimant's impairments, so too did Ms. McLaughlin—noting that Brown's impairments are "probably" related to prior head injury but providing no definitive statement that Brown's sleep disorders resulted from any head injury, let alone her 2010 accident, or further that her symptoms and limitations started before her insured status expired.")

Regarding LPCC Hawes' opinions, as this Court has previously recognized:

Finally, while some of Ms. Robinson's treating physicians opined well after her date last insured that she had been disabled during the relevant period, **courts have repeatedly affirmed an ALJ's decision to reject after-the-fact opinions that are unsupported by <u>objective evidence from the relevant period.</u>** *See Strong*, 488 F. App'x at 845 ("Although Dr. Cornett opined long after the relevant period that Claimant had been disabled during the relevant period, such a retrospective and conclusory opinion is not entitled to significant weight because it is not supported by relevant and objective evidence."); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (holding that ALJ properly discounted opinion of treating physician as speculative where treating physician had not seen claimant until two years after alleged onset date); *Gipson v. Comm'r of Soc. Sec.*, No. 5:16 CV 1108, 2017 WL 3732009, at *10 (N.D. Ohio Aug. 30, 2017) ("given the fact that Dr. Goswami's 2013 medical opinion post-dated Plaintiff's surgery by almost two years and lacks any support from relevant, objective evidence from the alleged onset date through the date last insured, the ALJ reasonably determined they had little probative value in determining Plaintiff's residual functional capacity from 2007 through 2011").

*Robinson v. Comm'r of Soc. Sec.*, Case No. 5:22-CV-01061-CEF, 2023 WL 4078487, at *9 (N.D. Ohio May 10, 2023) (emphasis added), *report and recommendation adopted by* 2023 WL 5103947 (N.D. Ohio Aug. 9, 2023).

The regulations state that the Commissioner will not use an individual's symptoms, nor a medical opinion, to establish the existence of an impairment. 20 C.F.R. § 404.1521. Kuntz failed to meet his burden of establishing the existence of a medically determinable impairment with objective medical evidence for the relevant time period.

For all of the reasons set forth above, the undersigned finds the ALD did not err in finding Kuntz was not disabled at Step Two and ending the sequential evaluation there.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: July 7, 2025          <u>s/ Jonathan Greenberg</u>
                                     Jonathan D. Greenberg
                                     United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).