UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IAN S. KUNTZ, | ) | CASE NO.:  5:24-cv-01849 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

Before the Court is Magistrate Judge Jonathan D. Greenberg's Report and

Recommendation ("R&R") recommending the Commissioner of Social Security's decision be

affirmed.  (Doc. 11.)  Plaintiff Ian S. Kuntz ("Kuntz") timely filed objections (Doc. 12), and

Defendant Commissioner of Social Security ("Commissioner") responded.  (Doc. 13.)

For the reasons stated herein, Kuntz's objections are OVERRULED, the R&R is

ACCEPTED and ADOPTED, and the Commissioner's final decision is AFFIRMED.

I.      BACKGROUND

A.      Kuntz's Medical History

Kuntz does not object to the factual record and procedural history in the R&R.  (*See* Doc.

12.)  Notwithstanding, the Court summarizes the facts pertinent to his objections.

1.      Medical and Other Evidence During the Claim Period at Issue

In an elementary school "End of Year Report" dated July 1995, Kuntz was noted as being

a "quiet boy" who "sometimes loses concentration and will day dream."  (Doc. 5 at 267-70.)[1]

---

[1] For ease and consistency, briefing citations reflect the electronically stamped CM/ECF

No special educational needs were listed. (*Id.*) In high school, he passed all classes during his freshman, sophomore, and senior years. (*Id.* at 272.) However, he failed many classes during his junior year and graduated high school in 2005 with a 2.02 GPA. (*Id.*)

On December 12, 2008, Kuntz went to the emergency room complaining of episodes where he felt like his heart was racing, was lightheaded, and felt as if he would pass out. (*Id.* at 343.) The treating physician noted normal exam findings and a normal EKG but opined that Kuntz may have experienced heart palpitations or may have tachycardia, requiring additional appointments with a physician. (*Id.* at 344.) His mental status was noted as normal. (*Id.* at 349.)

On January 17, 2009, Kuntz visited the emergency room for chest pain and heart palpitations. (*Id.* at 380.) Providers noted his pain may be associated with indigestion and his palpitations were resolved. (*Id.*) Kuntz explained he did not have these sensations when he was not eating. (*Id.* at 381.) He was recommended for an echocardiogram and prescribed Prilosec. (*Id.*) Providers noted full orientation, normal affect, and cooperative behavior. (*Id.* at 381-82.)

In 2006 and 2009, Kuntz attended Columbus State Community College for three quarters. (*Id.* at 253.) During the winter quarter of 2009, he completed 8 out of 12 credit hours with a cumulative GPA of 1.167. (*Id.*) In the winter quarter of 2006 and spring quarter of 2009, he was registered for multiple classes but did not complete any credit hours. (*Id.*)

### 2. Medical and Other Evidence After the Claim Period at Issue

On March 14, 2013, as a student at the University of Akron, Kuntz reached out to the Director of Student Health Services about potentially having bipolar disorder. (*Id.* at 263.) He was feeling extremely tired but had a "wired" feeling in his head and trouble sleeping. (*Id.*) The Director of Student Health Services asked to discuss his symptoms over the phone. (*Id.* at 264.)

---

document and PageID# rather than any internal pagination.

On December 5, 2017, Kuntz underwent a neuropsychological consultation.  (*Id.* at 392.)
Treatment providers noted he was alert, oriented, engaged, and able to participate in
conversation.  (*Id.*)  His thought process was "logical and goal-oriented."  (*Id.*)  He reported
hearing auditory "clicks," but the frequency and intensity of these sounds had decreased since
their onset.  (*Id.* at 392-93.)  Treatment providers reported:

> On an extensive measure of mood and personality, he demonstrated a consistent
> response style with no evidence of random endorsement of items. However, he
> endorsed an extremely high number of items that are sensitive to both over-
> reporting of symptoms and severe psychopathology. While this may be reflective
> of true psychopathology in some individuals, this pattern of responses is more often
> seen in individuals who are exaggerating their emotional distress in either a plea
> for help or other secondary gain.  As such, his clinical profile was deemed invalid
> and could not be further interpreted.

(*Id.* at 393.)

On December 7, 2017, Kuntz was admitted to Presbyterian Westchester Hospital for
severe expressed bipolar II disorder with psychotic features, moderate opioid use disorder, and
alcohol abuse.  (*Id.* at 391.)  He claimed he recently returned from Thailand where he was
previously admitted to a hospital for suicidality.  (*Id.*)  He reported a "long history of depression
and anxiety" since adolescence.  (*Id.* at 392.)  Kuntz also reported his mother died from cancer
when he was a teenager and his stepfather was abusive and kicked him out after her passing.
(*Id.*)  He claimed he was homeless since this time and used alcohol and opioids to cope with his
depression.  (*Id.*)  His condition on discharge was noted as "much improved," and he was
prescribed Lithium and Risperdal.  (*Id.* at 395.)

On December 14, 2017, Kuntz underwent an intake assessment at Portage Path
Behavioral Health where he reported irritability, difficulty focusing, and an inability to relax.
(*Id.* at 498.)  He was noted as having a cooperative behavior but impaired attention and
concentration with auditory hallucinations.  (*Id.* at 503.)

On December 21, 2017, Kuntz attended a medical consultation at the Summa Health Medical Group where he requested a lower dose of Risperdal.  (*Id.* at 574.)  He was reported as negative for depression, hallucinations, substance abuse, and suicidal ideas.  (*Id.*)  Kuntz was also noted as being nervous and anxious.  (*Id.*)  At a separate appointment on January 26, 2018, he stated he had stopped taking Risperdal and Lithium and that he felt disoriented and "pretty bad."  (*Id.* at 568.)  Upon evaluation, he was noted as experiencing depression, but negative for hallucinations, memory loss, substance abuse, and suicidal ideas.  (*Id.* at 569.)

Between January 31, 2018, and August 25, 2022, Kuntz attended psychiatric consultations with Dr. Benjamin Spinner ("Spinner").  (*Id.* at 696-706.)  During his initial evaluation, he told Spinner he was previously prescribed Wellbutrin and Fluoxetine, along with other medications, but they made him feel overstimulated.  (*Id.* at 706.)  Spinner noted Kuntz was attentive, had an organized thought process, but displayed a "confused" mood.  (*Id.* at 707.)  On February 26, 2019, Kuntz reported to Spinner he stopped taking Olanzapine because it made him feel numb and discouraged.  (*Id.* at 703.)  He also reported his mood improved after a recent therapy session.  (*Id.*)  On April 9, 2019, he discussed with Spinner that his mood was fluctuating and he recently quit his job as a busboy because he found it irritating.  (*Id.* at 701.)  Spinner suggested he take Depakote as a mood stabilizer, but at a later appointment Kuntz reported he had not started taking the medication.  (*Id.* at 700-01.)

On June 28, 2019, Spinner wrote a letter stating Kuntz suffers from bipolar I disorder with psychotic features, along with repeated cycles of mania, hypomania, psychosis, depression, and suicidal ideations.  (*Id.* at 389.)  Spinner opined he struggled with his psychiatric symptoms "most likely since his adolescence," and his response to medication has been limited.  (*Id.*)  Spinner also noted Kuntz benefitted from psychotherapy.  (*Id.*)

From February 2, 2018, to October 20, 2023, Kuntz also saw Anderson Hawes ("Hawes"), a Licensed Professional Clinical Counselor, for treatment.  (*Id.* at 1108-1300.) Treatment records during this period consistently noted he struggled with mania, depression, anxiety, obsessive thoughts, and being anxious, confused, depressed, or sad.  (*Id.*)

On October 1, 2019, Kuntz underwent a psychological consultative examination.  (*Id.* at 399.)  He reported having over 20 different jobs in his life and being terminated from 15 of them. (*Id.* at 401.)  His longest period of employment was for 8 months as a front desk employee at a boxing gym.  (*Id.*)  Kuntz reported difficulty staying focused and performing tasks in a timely manner.  (*Id.*)  He endorsed common symptoms of depression including poor quality of mood, feeling worthless, loss of energy, and insomnia, among others.  (*Id.*)  He also endorsed symptoms indicative of mania such as distractibility, impulsivity, mood swings, and racing thoughts.  (*Id.*) The examination found Kuntz's intellectual functioning appeared within normal limits and his attention and concentration skills were satisfactory.  (*Id.* at 403.)  He also described symptoms of mania and depression "that may compromise his ability to respond to work pressures."  (*Id.* at 405.)

On September 28, 2020, Spinner wrote a second letter opining Kuntz's bipolar disorder was severe and persistent, and he experienced regular paranoia, hallucinations, and delusions. (*Id.* at 408.)  Spinner also reported Kuntz suffers from recurrent episodes of psychosis in both manic and depressive mood states, and these episodes have been present "likely since his adolescence."  (*Id.*)

Kuntz received treatment from EMS personnel several times.  On January 10, 2020, Kuntz had an anxiety attack.  (*Id.* at 1059.)  He reported to EMS this occurred while he was exercising and he did not feel safe going home.  (*Id.* at 1061.)  He did not wish to go to the

hospital and reported feeling better after conversing with EMS personnel.  (*Id.*)  On November 29, 2022, he sought EMS assistance for a panic attack when he believed food was stuck in his throat.  (*Id.* at 1074.)  On March 14, 2023, he requested EMS assistance because he woke up from a deep sleep and was unsure what day it was, causing him to panic.  (*Id.* at 1076.)  EMS responded to Kuntz's requests for assistance on several other occasions.  (*See id.* at 1068-76.)

Between November 2020 and April 2023, Kuntz also visited the emergency room on multiple occasions.  On November 23, 2020, Kuntz complained of mood changes and stated he was afraid of going into a complete manic episode.  (*Id.* at 417.)  He was reported as not having taken his medication in two years.  (*Id.*)  Upon examination, he was noted as having good insight, judgment, and intact memory.  (*Id.* at 418.)  On September 15, 2022, Kuntz presented himself at the emergency room for heart palpitations and a self-reported panic attack.  (*Id.* at 1078.)  He denied hallucinations and suicidal ideations.  (*Id.*)  On April 29, 2023, he went to the emergency room requesting inpatient psychiatric admission after experiencing increased anxiety and believing he was experiencing a manic episode.  (*Id.* at 1040.)  He demonstrated "some disorganization in thought process" and was difficult to follow at times.  (*Id.*)  Kuntz was determined to require involuntary psychiatric admission.  (*Id.* at 1045.)

On October 10, 2023, Kuntz's sister, Tracy Cochran ("Cochran"), wrote a letter in support of Kuntz's application for Social Security Disability Benefits.  (*Id.* at 300.)  Kuntz had discussed seeing "scary things" at age 7, but no action was taken to provide him with medical attention.  (*Id.*)  Between the ages of 10 and 18, he talked nonstop and suffered from intense headaches.  (*Id.*)  She also wrote that during his adolescent years, Kuntz "appeared to have social impairments," including panic attacks and worries he was suffering from a heart attack.  (*Id.*)  During this period, he had difficulty focusing in school.  (*Id.*)  Cochran also described how

Kuntz's mental health episodes worsened in adulthood, particularly after their mother passed away.  (*Id.* at 301.)  Cochran believed his mental health issues "began early on without our mother or any other adult seeking help for Ian."  (*Id.*)

On July 18, 2023, Hawes sent a letter to Kuntz's attorney summarizing his assessment and treatment of him from 2018 to 2023.  (*Id.* at 1049-50; *see id.* at 1108-1300.)  Hawes concluded Kuntz had been experiencing debilitating symptoms including pronounced mood instability, delusions, hallucinations, paranoia, and avoidant behavior suggestive of a severe and persistent psychotic disorder "that first appeared in early adolescence."  (*Id.* at 1049.)  Hawes also detailed how Kuntz was diagnosed with bipolar I disorder, recurrent with psychotic features.  (*Id.* at 1050.)  Hawes stated his "instability since adolescence had resulted in recurrent episodes of hospitalizations, emergency room visits, intensive outpatient treatments and multiple failed attempts of various medication regimens."  (*Id.* at 1049.)

On November 6, 2023, Hawes wrote a second letter to Kuntz's attorney.  (*Id.* at 1325-26.)  Hawes stated he had reviewed Kuntz's school records, family member reports, and medical records from 2008 and 2009 and concluded "by a preponderance of evidence that Mr. Kuntz had been suffering from Bipolar Depression with Psychotic Features, Anxiety, Post Traumatic Stress Disorder . . . throughout his adolescence."  (*Id.* at 1325.)  Hawes further opined Kuntz would have frequent issues responding appropriately to regular work criticism and interaction with co-workers and supervisors.  (*Id.* at 1326.)

**B.      State Agency Reports**

On January 15, 2023, a state agency medical consultant reviewed Kuntz's medical history and found his file insufficient prior to age 22.  (*Id.* at 82.)  He was assessed to not be disabled.  (*Id.* at 83.)

On April 18, 2023, upon reconsideration, a separate state agency medical consultant found the prior assessment was consistent with and supported by the evidence.  (*Id.* at 88.)  The previous medical consultant's findings were affirmed as written.  (*Id.* at 89.)

### C.      Application for Child's Insurance Benefits

On August 22, 2022, Kuntz applied for Child's Insurance Benefits ("CIB"), alleging a disability onset date of April 1, 1987.  (*Id.* at 37.)  Kuntz applied for CIB based upon his bipolar disorder, anxiety, and post-traumatic stress disorder.  (*Id.* at 78.)  On January 18, 2023, Kuntz's claim was denied.  (*Id.*)  Reconsideration was denied on April 18, 2023.  (*Id.* at 105.)  On April 27, 2023, Kuntz filed a written request for a hearing before an Administrative Law Judge ("ALJ").  (*Id.* at 108.)

On November 9, 2023, Kuntz, who was represented by counsel, testified before an ALJ. (*Id.* at 49.)  A Vocational Expert was also present.  (*Id.*)  During the hearing, Kuntz requested to amend his alleged onset date to December 12, 2008.  (*Id.* at 51-52.)

At the hearing, Kuntz testified that he graduated from high school.  (*Id.* at 53.)  He was never held back but had to take summer school because of failing grades.  (*Id.*)  Kuntz always had issues with truancy in school.  (*Id.* at 58-59.)  His mother passed away when he was in high school and his stepfather kicked him out shortly after.  (*Id.* at 56.)

After Kuntz graduated, he got fired from several jobs.  (*Id.* at 55-56.)  He constantly had heart palpitations and panic attacks but did not have insurance or money for treatment.  (*Id.* at 56.)  Kuntz recalled not leaving his room for a long period of time before he turned 22, and now believes he was probably in a serious depressive state.  (*Id.* at 57-59.)  He did not receive regular treatment until 2017.  (*Id.* at 56.)

On November 20, 2023, the ALJ found Kuntz was not disabled prior to age 22 and not entitled to CIB.  (*Id.* at 37-41.)  The ALJ made the following findings of fact:

> 1. Born on March 17, 1987, the claimant had not attained age 22 as of April 1, 1987, the alleged onset date (20 CFR 404.102 and 404.350(a)(5)).
>
> 2. The claimant has not engaged in substantial gainful activity since April 1, 1987, the alleged onset date (20 CFR 404.1571 et seq.).
>
> 3. Prior to the date the claimant attained age 22, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment (20 CFR 404.1520(c)).
>
> 4. The claimant has not been under a disability, as defined in the Social Security Act, at any time prior to March 16, 2009, the date he attained age 22 (20 CFR 404.350(a)(5) and 404.1520(c)).

(*Id.* at 37-41.)  On September 10, 2024, the Appeals Council declined review.  (*Id.* at 20.)

### D.    Procedural History

On October 24, 2024, Kuntz filed the instant case.  (Doc. 1.)  He raised one assignment of error.  (Doc. 6 at 1327, 1336.)  On July 7, 2025, the R&R recommended affirming the Commissioner's final decision.  (Doc. 11.)  Kuntz timely submitted six specific objections.  (Doc. 12.)  The Commissioner responded.  (Doc. 13.)

## II.    LAW AND ANALYSIS

### A.    Standard of Review

A district court "shall make a *de novo* determination of those portions or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C) (flush language); *see Powell v. United States*, 37 F.3d 1499 (Table), 1994 WL 532926, 1994 U.S. App. LEXIS 35044 *1 (6th Cir. Sept. 30, 1994) ("Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to *de novo* review by the district court in light of specific objections filed by any party.") (citations omitted).

"A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C) (flush language).

Under the authority of the Social Security Act, the Social Security Administration has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is eighteen years old or older and has a disability that began before attaining the age of twenty-two.  20 C.F.R. § 404.350(a)(5).  The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The impairment must prevent the claimant from doing the claimant's previous work, as well as any other work which exists in significant numbers in the region where the individual lives or in several regions of the country.  42 U.S.C. § 423(d)(2)(A).  In making a disability determination, an ALJ engages in a five-step sequential evaluation:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled. To be severe, the claimant must have a severe medically determinable physical or mental impairment, or a combination of impairments, that must have lasted or be expected to last for at least 12 months, unless it is expected to result in death.

3. If the claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment in Appendix 1 to Subpart P of Part 404, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 426 (6th Cir. 2018) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)).

During the first four steps, the claimant bears the burden of proof. *Walters*, 127 F.3d at 529. The "burden shifts to the Commissioner only at step five." *Id.*

The Court's review of the Commissioner's decision to deny benefits is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). "Substantial evidence is 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 521 (6th Cir. 2008) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal citation omitted)). "The standard 'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Edwards v. Comm'r of Soc. Sec.*, No. 23-5490, 2024 U.S. App. LEXIS 3315, 2024 WL 2705000, at *2 (6th Cir. Feb. 12, 2024) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (citation omitted)). If substantial evidence supports the Commissioner's finding that the claimant is not disabled, that finding must be affirmed even if the reviewing court would decide the matter differently. *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citation omitted).

A reviewing court is not permitted to resolve conflicts in evidence or to decide questions of credibility. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted). The

Commissioner's decision must be affirmed even if the claimant's position is also supported by substantial evidence. *Wallace v. Comm'r of Soc. Sec.*, 221 F.3d 1337 (Table), 2000 U.S. App. LEXIS 24244, 2000 WL 799749, at *1 (6th Cir. 2000) (citing *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993)). "Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007)).

### B. First Objection: The Court Misconstrued the Purpose of Retrospective Opinions Under SSR 18-01p

SSR 18-01p provides that "[i]f we find that a claimant meets the statutory definition of disability and meets the applicable non-medical requirements during the period covered by his or her application, we then determine the claimant's EOD [Established Onset Date]." SSR 18-01p, 2018 WL 4945639, at *2. In doing so, the ALJ "shall consider all evidence available in [an] individual's case record." *Id.* at *4. Where "there was no finding that the claimant is disabled as a result of his mental impairment or any other impairments or combination thereof, no inquiry into onset date is required." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see also Seeley v. Comm'r of Soc. Sec.*, 600 F. App'x 387, 392 (6th Cir. 2015); *Anton v. Comm'r of Soc. Sec.*, No. 5:23-CV-00391-CEH, 2024 U.S. Dist. LEXIS 20864, 2024 WL 449534, at *13 (N.D. Ohio Feb. 6, 2024).

In his objection, Kuntz argued SSR 18-01p permits adjudicators to consider retrospective medical opinions to establish an earlier onset date. (Doc. 12 at 1400.) To Kuntz, "[t]he Court's heavy reliance on the temporal distance of the medical opinions improperly applie[d] a heightened evidentiary burden that SSR 18-01p does not impose." (*Id.*) Kuntz also cited case

law supporting the contention that a claimant's subjective complaints may support a finding of disability, so long as there is objective medical evidence of an underlying condition.  (*Id.* at 1401) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 150-51 (6th Cir. 1990)).

Kuntz cannot object that the ALJ improperly applied SSR 18-01p because the ALJ found Kuntz was not disabled.  (Doc. 5 at 39-40.)  Accordingly, the ALJ was not required to conduct an inquiry into the established onset date of Kuntz's impairments.  *Key*, 109 F.3d at 274.  The ALJ's decision shows that she did not.  (Doc. 5 at 39-40.)  Instead, the ALJ determined—using all available evidence, including medical records and the opinions of Spinner and Hawes—that Kuntz was not disabled.  (*Id.*)  The R&R did not address Kuntz's established onset date or the applicability of SSR 18-01p because the ALJ found Kuntz was not disabled.  (*See* Doc. 11; Doc. 5 at 40.)  "Because the ALJ did not find Claimant to be disabled, SSR 18-01p does not apply." *Anton*, 2024 WL 449534, at *13.

Kuntz's first objection is OVERRULED.

### C.  Second Objection: The Court Improperly Dismissed Functional Evidence from Kuntz's School Records

"A severe mental impairment is 'established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms.'"  *Griffith v. Comm'r*, 582 F. App'x 555, 559 (6th Cir. 2014) (quoting 20 C.F.R. § 416.908).  If no signs or laboratory findings support the existence of an impairment, it is appropriate to terminate the disability analysis.  *See* SSR 16-3p, 2017 WL 5180304, at *4 ("If an individual does not have a severe medically determinable impairment that meets our duration requirement, we will find the individual not disabled at step 2.").  "When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals

trained in the field of psychopathology." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (internal quotation marks and citations omitted).

ALJs must "consider all evidence in your case record when [they] make a determination or decision whether you are disabled." 20 C.F.R. § 404.1520. However, "an ALJ's failure to cite specific evidence does not indicate it was not considered." *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) (citing *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Rather, "an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (citation omitted).

Citing no binding legal authority, Kuntz contends "[f]ailing to properly consider relevant school records is legal error, especially in mental health cases where academic performance is an important part of diagnosis." (Doc. 12 at 1401.) In objecting that the ALJ committed legal error, Kuntz cites SSR 18-01p and "applicable regulations" that require ALJ's to consider "all relevant evidence." (*Id.*)

As discussed above, SSR 18-01p is not relevant to the ALJ's inquiry here because she found Kuntz was not disabled. (*See* Doc. 5 at 40.) To be sure, 20 C.F.R. § 404.1520, which governs evaluations of disability, instructs ALJs to "consider all evidence in your case record." 20 C.F.R. § 404.1520(a)(3); *see also* SSR 16-3p, 2017 WL 5180304, at *2 (directing ALJs to "consider all of the evidence in an individual's record" when evaluating a claimant's symptoms for disability claims). But "a duty to 'consider' the evidence is different from a duty to 'discuss' the evidence." *Jones v. Comm'r of Soc. Sec.*, No. 5:24-CV-1690, 2025 U.S. Dist. LEXIS 92360, 2025 WL 1400727, at *8 (N.D. Ohio Apr. 28, 2025), *report and recommendation adopted*, No. 5:24-CV-1690, 2025 U.S. Dist. LEXIS 91518, 2025 WL 1398698 (N.D. Ohio May 14, 2025).

Consistent with the applicable regulations, the ALJ indicated she made a "careful consideration of the entire record," which included Kuntz's school records.  (Doc. 5 at 39.)  The ALJ was under no obligation to specifically mention them in her decision.  *Kornecky*, 167 F. App'x at 508.  Instead, the ALJ chose to discuss Kuntz's medical treatment records, the medical opinions of Spinner and Hawes, and the letter written by Kuntz's sister when concluding Kuntz did not suffer from a medically determinable impairment.  (Doc. 5 at 40.)  While the R&R acknowledged the ALJ did not discuss Kuntz's school records, it recommended affirming the ALJ's decision because Kuntz failed to meet his burden of establishing the existence of a medically determinable impairment.  (Doc. 11 at 1397-98.)

Ultimately, it remained Kuntz's burden to establish his disability.  *Key*, 109 F.3d at 274. Kuntz cites no regulations or case law indicating the ALJ's failure to mention his school records is legal error.  (*See* Doc. 12 at 1401.)  Rather, Kuntz cites *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995), for its holding that "retrospective medical diagnoses, when corroborated by lay or school records, can substantiate disability prior to the expiration of insured status."  (*Id.*)  While *Jones* emphasizes the importance of "subjective evidence from lay observers" in corroborating retrospective medical opinions, this is not the purpose of Kuntz's second objection.  *Jones*, 65 F.3d at 104.  Kuntz objected that the ALJ committed legal error by not specifically citing his school records.  (Doc. 12 at 1401.)  Having indicated she considered the entire record, the ALJ was not legally required to discuss every piece of evidence.  *Kornecky*, 167 F. App'x at 508. Even so, the out-of-circuit decision in *Jones* does not require ALJs to cite to all record evidence.

Kuntz's second objection is OVERRULED.

### D.      Third Objection:  The Court Failed to Recognize the Distinct Evidentiary Context of Mental Impairments

At step two, "the claimant must show that he suffers from a severe medically determinable physical or mental impairment."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) (citing 20 C.F.R. § 404.1520(a)(4)(ii)).  In doing so, "the claimant has the burden of proof."  *Walters*, 127 F.3d at 529.  A claimant must establish a physical or mental impairment using "objective medical evidence from an acceptable medical source."  20 C.F.R. § 404.1521.  Acceptable medical sources include licensed physicians and psychologists.  20 C.F.R. § 404.1502.  Objective medical evidence means "signs, laboratory findings, or both."  *Id.*  In addition, "[s]igns means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)."  *Id.*  "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated."  *Id.*  The ALJ "must have objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment."  SSR 16-3p, 2017 WL 5180304, at *3.

Kuntz objects that the ALJ applied "an excessively rigid evidentiary standard, such as demanding contemporaneous clinical poof within a narrow time frame," which "disregards the recognized nature of mental impairments and controlling case law."  (Doc. 12 at 1402.)  To him, courts routinely acknowledge mental health conditions that often lack definitive laboratory evidence, and subjective complaints can establish disability.  (*Id.* at 1401-02.)

The ALJ's decision does not indicate she applied a greater evidentiary standard than the regulations required.  Nor did the ALJ require a heightened level of contemporaneous clinical proof.  Rather, it was Kuntz's burden to submit objective medical evidence from any period

between his amended alleged onset date of December 12, 2008, and March 16, 2009, the date he attained age 22. *Walters*, 127 F.3d at 529. Notwithstanding, the ALJ considered objective medical evidence beyond Kuntz's amended timeframe, including a 2003 physical examination which revealed no abnormalities. (Doc. 5 at 40, 339.) The ALJ's "consideration of the entire record" also included treatment records Kuntz submitted from 1997 to 2003. (*Id*. at 39, 312-39.) The ALJ also cited a 2008 medical appointment where Kuntz was treated for "possible" palpitations that were resolved, and a 2009 appointment where he was treated for urticaria. (*Id.* at 40, 343, 380.) Additionally, the ALJ cited normal electrocardiographic studies and x-rays during the relevant period. (*Id.* at 40, 343, 373, 381.)

Kuntz relies on *Blankenship v. Bowen*, 874 F.2d 1116, 1121-23 (6th Cir. 1989), to argue that "[t]he Sixth Circuit has long recognized the legitimacy of diagnosing mental impairment without objective laboratory evidence." (Doc. 12 at 1401.) Not so. In relevant part, *Blankenship* held that "when mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology." *Blankenship*, 874 F.2d at 1121 (quoting *Poulin v. Bowen,* 817 F.2d 865, 873-74 (D.C. Cir. 1987)). *Blankenship*'s holding is consistent with the current applicable regulations which permit psychiatric and other objective medical evidence that supports a medically determinable mental impairment. *See* 20 C.F.R. § 404.1502.

The ALJ followed these regulations when evaluating the objective medical evidence Kuntz submitted, in addition to the medical opinions of Spinner and Hawes and the letter from Kuntz's sister. (Doc. 5 at 40.) Despite Spinner and Hawes's qualifications, the ALJ cannot credit medical *opinions* when the regulations mandate that medical *evidence* must support the "existence of an impairment." 20 C.F.R. § 404.1521. Accordingly, the ALJ determined "there

are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment." (Doc. 5 at 40.) The ALJ applied the proper legal standards.

Kuntz's third objection is OVERRULED.

### E. Fourth Objection: *McClenton*'s Applicability Turns on Evidentiary Principles, Not Diagnosis

Kuntz relies on *McClenton v. Comm'r of Soc. Sec.*, 2023 U.S. Dist. LEXIS 5124, 2023 WL 154823, at *5 (W.D. Mich. Jan. 11, 2023), to assert retrospective medical opinions are valid to establish onset dates for progressive or longstanding conditions, even without immediate supporting documentation. (Doc. 12 at 1402.) To Kuntz, the R&R incorrectly limited *McClenton* to its underlying diagnosis of Huntington's disease instead of accepting its broader evidentiary principles. (*Id.*)

The R&R noted *McClenton* was factually distinguishable from the instant case because the claimant suffered from Huntington's disease, a progressive neurodegenerative disease that differs from Kuntz's diagnoses. (Doc. 11 at 1395.) The R&R also observed the holding in *McClenton* does not bind this Court. (*Id.*) *McClenton* relies on Fourth Circuit authority finding "'lay observations of a claimant's condition during the relevant time period' can provide the requisite 'linkage' to support 'retrospective consideration of medical evidence.'" 2023 WL 154823, at *5 (quoting *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)). This authority is also non-binding precedent.

Kuntz cites no binding authority to support his argument that evidence in his school transcripts, medical records, and lay testimony created a "linkage" that established proof of a medically determinable impairment. Moreover, the letters of Spinner and Hawes hardly engage with these records. In his letter dated June 28, 2019, Spinner did not cite to any of these records and only claimed Kuntz struggled with psychiatric symptoms "most likely" since adolescence.

(Doc. 5 at 389-90.)  Spinner's second letter, dated September 8, 2020, also claimed Kuntz's

impairments have been present "likely" since his adolescence.  (*Id.*)  This letter also did not cite

or reference any medical or other evidence from before Kuntz attained age 22.  (*Id.*)

Hawes opined that Kuntz's impairments "first appeared in early adolescence."  (*Id.* at

1049.)  Hawes stated he relied on Kuntz's school records and corroboration from Kuntz's sister

but did not mention medical records from the relevant period.  (*Id.*)  In a second letter dated

November 6, 2023, Hawes claimed he reviewed Kuntz's "historical medical and school records

and corroborated family member reports" to determine Kuntz had been suffering from multiple

impairments "throughout his adolescence, early and current adult life."  (*Id.* at 1325.)

Regardless of *McClenton*'s holding, the ALJ properly classified these letters as "opinions

of two treating sources" that "cannot be substituted for medical evidence."  (*Id.* at 40.)  The ALJ

further noted "neither [Spinner nor Hawes] had initially met with the claimant until more than

five years after his attainment of age twenty-two."  (*Id.*)  Each of their letters were dated over a

decade past this time.  As discussed above, an ALJ cannot use "a medical opinion to establish the

existence of an impairment."  20 C.F.R. § 404.1521.  Instead, the ALJ must rely on objective

medical evidence.  *Id.*  Citing non-binding case law does not change the fact that it was Kuntz's

burden to provide sufficient evidence showing he suffered from an impairment prior to age 22.

*Walters*, 127 F.3d at 529.

Kuntz's fourth objection is OVERRULED.

**F.     Fifth Objection: The Opinions of Spinner and Hawes were Mischaracterized as "Speculative"**

The Court's "review of an ALJ's social security decision is quite limited."  *Masterson v.*

*Comm'r of Soc. Sec.*, No. 24-5512, 2025 U.S. App. LEXIS 2135, 2025 WL 317501, at *1 (6th

Cir. Jan. 28, 2025).  Courts are not permitted to "weigh evidence, assess credibility, or resolve

conflicts in testimony."  *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019);

*Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  "Unless the ALJ

has failed to apply the correct legal standards or has made findings of fact unsupported by

substantial evidence in the record, we must affirm the Commissioner's conclusions."  *Emard v.*

*Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020).

A "retrospective and conclusory opinion is not entitled to significant weight" when it is

"not supported by relevant and objective evidence."  *Strong v. Soc. Sec. Admin.*, 88 F. App'x

841, 845 (6th Cir. 2004); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009)

(holding that the ALJ properly discounted the opinion of a treating physician where they had not

seen claimant until two years after the alleged onset date).  "[C]ourts have repeatedly affirmed an

ALJ's decision to reject after-the-fact opinions that are unsupported by objective evidence from

the relevant period."  *Robinson v. Comm'r of Soc. Sec.*, No. 5:22-CV-01061-CEF, 2023 U.S.

Dist. LEXIS 108417, 2023 WL 4078487, at *9 (N.D. Ohio May 10, 2023), *report and*

*recommendation adopted*, No. 5:22-CV-01061-CEF, 2023 U.S. Dist. LEXIS 139123, 2023 WL

5103947 (N.D. Ohio Aug. 9, 2023) (citing *Strong.*, 88 F. App'x at 845 ("[e]vidence of disability

obtained after the expiration of insured status is generally of little probative value.")).

In his objection, Kuntz argued the opinions of Spinner and Hawes were corroborated by

other evidence and, therefore, not speculative.  (Doc. 12 at 1402.)  To him, the ALJ "improperly

discounted [their] reasoned retrospective opinions without meaningful engagement."  (*Id.* at

1402-03.)

Kuntz's fifth objection asks the Court to impermissibly weigh the medical opinions of

Spinner and Hawes and assess conflicting evaluations of Kuntz's medical history.  *Brainard*, 889

F.2d at 681.  Neither the ALJ's decision nor the R&R refer to Spinner's and Hawes's opinions as

"speculative."  (*See* Doc. 5 at 39-40; Doc. 11 at 1397-98.)  Instead, the ALJ simply restated that medical opinions like theirs "cannot be substituted for medical evidence."  (Doc. 5 at 40.)  While the ALJ acknowledged Spinner and Hawes believed Kuntz's records suggested "proof of an extant, but undiagnosed, psychiatric disorder," she noted "neither source had initially met with the claimant until more than five years after his attainment of age twenty-two."  (*Id.*)  The ALJ also referenced the letter from Kuntz's sister, stating "no action was taken to provide [Kuntz] with medical or other help" and there was "no medical evidence" during the relevant period. (*Id.*)  Having reviewed Kuntz's "entire record" for the relevant period, the ALJ determined he had no medically determinable impairment.  (*Id.* at 39.)

The ALJ also properly determined Kuntz's treatment records from 2003, 2008, and 2009 showed "no past medical or surgical history."  (Doc. 50 at 40.)  Against this backdrop, the ALJ assessed the opinions of Spinner and Hawes and found "there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment."  (*Id.*)  The ALJ did not commit legal error.  *See Strong.*, 88 F. App'x at 845; *Allen*, 561 F.3d at 651.

Kuntz's fifth objection is OVERRULED.

### G. Sixth Objection: The ALJ's Step Two Analysis Violated the "De Minimis" Standard

At step two of the sequential evaluation process, an ALJ must evaluate whether a claimant has a "medically determinable physical or mental impairment."  20 C.F.R. § 404.1520. A medically determinable impairment "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. § 404.1521.   "After we establish that you have a

medically determinable impairment(s), then we determine whether your impairment(s) is severe." *Id.*

"A 'severe' impairment is 'any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)). "Step two has been described as a '*de minimis* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers*, 486 F.3d at 243 n.2 (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988)). "If the claimant does not have a severe medically determinable physical or mental impairment—i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities—the claimant is not disabled." *Rabbers*, 582 F.3d at 652. At this step, "the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

Kuntz argues that the ALJ violated the "*de minimis* standard" at step two because an impairment "only requires a minimal showing of severity." (Doc. 12 at 1403.) To him, the ALJ imposed "an improperly stringent standard" by "rejecting supportive retrospective medical opinions and corroborative school records." (*Id.*)

Kuntz cannot argue the ALJ misapplied this standard because it first required Kuntz to meet his burden of proving that a medically determinable impairment existed. *See* 20 C.F.R. § 404.1521; *Jones*, 336 F.3d at 474. Kuntz conflates the ALJ's finding of no medically determinable impairment with a finding of no severe impairment, which are two separate findings. (Doc. 11 at 1390 n.4 (citing 20 C.F.R. § 404.1521).) Here, the ALJ concluded that no

medically determinable impairments existed for the relevant period.  (Doc. 5 at 40.)  Although Kuntz complains of the ALJ's treatment of his subjective complaints, medical opinions, and school records, the applicable regulations require Kuntz to establish the existence of a medically determinable impairment with objective medical evidence for the relevant time period.  *See* 20 C.F.R. § 404.1521.  He failed to do so here, so the "*de minimis*" standard did not apply.  *Id.*  The ALJ did not commit legal error.

Kuntz's sixth objection is OVERRULED.

## III.     CONCLUSION

For the reasons stated herein, Plaintiff Ian S. Kuntz's objections are OVERRULED, the R&R is ACCEPTED and ADOPTED, and the final decision of the Commissioner of Social Security is AFFIRMED.

**IT IS SO ORDERED.**

Date: March 23, 2026

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE